**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

PLAN 3, INC.,                                    *

          Plaintiff,                      *

            v.                              *          Civil Action No. AW-05-1581

GE GROUP ADMINISTRATORS, INC.,    *
*et al.*
          Defendants.                   *
                 **\*\*\*\*\***

## MEMORANDUM OPINION

This action involves a suit brought by Plan3, Inc. ("Plan3" or "Plaintiff") against Defendants GE Group Administrators, Inc. ("GEGA") and Genworth Financial, Inc. ("Genworth") for breach of contract, defamation, and negligent misrepresentation. Currently pending before the Court are Genworth's Motion to Dismiss for Lack of Personal Jurisdiction [9] and GEGA's Motion to Dismiss for Failure to State a Claim [11].  The Court has reviewed the entire record, as well as the Pleadings with respect to the instant motions.  No hearing is deemed necessary.  *See* Local Rule 105.6 (D. Md. 2004).  For the reasons stated below, the Court will grant Defendants' Motions to Dismiss.

## I.      FACTUAL & PROCEDURAL BACKGROUND

The following facts are taken in the light most favorable to the non-movant. Plan3 is a Maryland corporation involved in the development and marketing of health care plans. In December 2002, Plan3 entered into a letter agreement (the "Agreement") with GEGA and GE Group Life Assurance Company ("GEGLAC"), two wholly-owned subsidiaries of defendant Genworth, to establish a health reimbursement pilot program (the "Pilot Program"). The Agreement provided that Plan3 would identify employers whose health benefits plans met certain criteria and encourage them to enroll in the Pilot Program, through which they would have the opportunity to negotiate health

care administrative services agreements ("ASAs") with GEGA and to purchase stop-loss coverage from GEGLAC. Plan3, in turn, would receive a commission of 3% on the premiums paid by the employers. The Agreement also provided that GEGA would negotiate the ASAs "in good faith" and that it would "[p]erform the services" under each ASA "consistent therewith."

The Agreement stated that its terms would expire in six months—on June 1, 2003—and that it would not be subject to automatic renewal. Nonetheless, the parties periodically renewed the Agreement until September 30, 2004, when GEGA and GEGLAC decided against further renewal. Prior to the Agreement's termination, Plan3 identified and enrolled 23 employers into the Pilot Program. During the pendency of the Pilot Program, participating employers would, pursuant to the ASAs, submit all their medical claims to GEGA for processing and disposition. GEGA would in turn generate Explanations of Benefits ("EOBs"), which are periodic summaries of the claims filed and adjudicated. The EOBs would be transmitted to the employers and to Plan3, who had agreed to assist the employers in tracking and coordinating their benefit payments.   In exchange for its administrative services, Plan3 received, in addition to its fees under the Agreement, compensation from the individual Pilot Program participants. The effect of this arrangement was to make Plan3's ability to service the employers dependent upon GEGA's performance under the ASAs; as stated in the Complaint, the "efficient and accurate processing of EOBs and payment of claims by GEGA was critical to the efficacy of the plans developed [by Plan3] for Pilot Program participants." (Compl. ¶ 18.)

Plan3 alleges that after GEGA transitioned to a new type of claims processing program in January 2004, GEGA began to experience difficulties in performing its claims-related services under the ASAs. According to Plan3, after GEGA implemented its new system, employers were plagued

by a host of claims adjudication problems, among them lost and incorrect claims, erroneous EOBs, improper denials of claims, failure to accept claims transmitted electronically, and numerous other difficulties. Plan3 alleges that it was falsely assured by Genworth that any difficulties caused by the new claims processing platform were minor, temporary, and easily rectifiable, when in fact these problems were significant and widespread. GEGA's mishandling of claims persisted for several months, during which time a massive backlog of unprocessed claims developed, until, in August and September of 2004, GEGA submitted a "flood" of claims that overwhelmed Plan3 and the accounts of the employers in the Pilot Program. On September 30, 2004, GEGA and GEGLAC declined to renew the Agreement with Plan3 and began contacting the participating employers and encouraging them to either work directly with GEGA or to engage a new administrator to adjudicate their claims—in other words, to cut Plan3 out of the claims administration process. Plan3 alleges that it was maligned, defamed, and cast as a scapegoat for GEGA's errors and failings, despite earlier assurances by GEGA that it would accept responsibility for the claims processing problems. Ultimately, Plan3 lost many of the clients it had enrolled into the Pilot Program, who switched to a new administrator, along with milions of dollars in anticipated administrative fees.

On June 13, 2005, Plan3 filed a three-count Complaint in this Court, asserting claims of breach of contract, defamation, and negligent misrepresentation. Defendant Genworth has moved to dismiss for lack of personal jurisdiction, and defendant GEGA has moved to dismiss for failure to state a claim upon which relief may be granted. Those motions have been fully briefed and are ready for disposition.

## II.    DISCUSSION

### A.    Genworth's Rule 12(b)(2) Motion to Dismiss

Genworth has moved to dismiss for lack of personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2). Genworth argues that it was not a party to the contract that gave rise to this dispute, that it did not perform any of the wrongful acts alleged in the Complaint, and that it has insufficient contacts with the State of Maryland to warrant the imposition of personal jurisdiction in this forum.

<u>Applicable Legal Standard</u>

Under Federal Rule of Civil Procedure 12(b)(2), the party asserting personal jurisdiction has the burden of proving the existence of a ground for jurisdiction by a preponderance of the evidence. *Combs v. Bakker*, 886 F.3d 673, 676 (4th Cir. 1989). If the existence of jurisdiction turns on disputed facts, the court may resolve the challenge after a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question. *Id.* If the court chooses to rule without conducting an evidentiary hearing, relying solely on the basis of the complaint, affidavits and discovery materials, "the plaintiff need only make a prima facie showing of personal jurisdiction." *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003); *see also Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F3d 56, 60 (4th Cir. 1993); *Combs*, 886 F.2d at 676. In determining whether the plaintiff has proven a prima facie case of personal jurisdiction, the court "must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *Mylan,* 2 F.3d at 60; *Carefirst of Maryland*, 334 F.3d at 396.

A court may exercise personal jurisdiction over a non-resident defendant if: (1) the relevant state long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction comports with Fourteenth Amendment Due Process standards. *Ellicott Machine Corp., Inc. v. John*

*Holland Party, Ltd.*, 995 F.2d 474, 477 (4th Cir. 1993).

Maryland's long-arm statute provides, in pertinent part:

> (b) A court may exercise personal jurisdiction over a person, who directly or by an agent:
> (1) Transacts any business or performs any character of work or service in the State;
> (2) Contracts to supply goods, food, services, or manufactured products in the State;
> (3) Causes tortious injury in the State by an act or omission in the State;
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;
> (5) Has an interest in, uses, or possesses real property in the State; or
> (6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

Md. Code Ann., Cts. & Jud. Proc. § 6-103 (2002).  Maryland's long-arm statute has been interpreted as coterminous with the limits of the Due Process Clause of the Fourteenth Amendment.  *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002).  Therefore, "the statutory inquiry necessarily merges with the constitutional inquiry and the two inquiries become one."  *Id.*

The exercise of personal jurisdiction over a non-resident defendant comports with the Due Process Clause only where the defendant has certain "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 941-42 (4th Cir. 1994).  A defendant's contact with the forum state must be such that the defendant could reasonably anticipate being brought into court in that state.  *See Foster v. Arletty 3 Sarl*, 278 F.3d 409, 415 (4th Cir. 2002).

In considering the question of personal jurisdiction, the Supreme Court has drawn a distinction between "specific" and "general" jurisdiction. *See Helicopteros Nacionales de Columbia v. Hall*, 466 U.S. 408, 414 (1984). Specific jurisdiction exists where a suit arises from a defendant's contacts with the forum state. *Id.* General jurisdiction, which permits a court to subject a non-resident defendant to a suit in the forum wholly unrelated to any contact it has with the forum, exists only where a foreign defendant's in-state activities amount to "continuous and systematic" contact with the state. *Id.* at 414-15. The levels of contact required for the exercise of general jurisdiction are significantly higher than that required for specific jurisdiction. *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 628 (4th Cir. 1997).

<u>Analysis</u>

**A. General Jurisdiction**

Genworth is a holding company, organized under the laws of Delaware, with its principal place of business in Virginia. Therefore, as a nonresident defendant, general jurisdiction over Genworth would be proper only if it maintained "continuous and systematic general business contacts" with Maryland. *Helicopteros*, 466 U.S. at 416. In the context of personal jurisdiction, the Fourth Circuit has cautioned that "broad constructions of general jurisdiction should be generally disfavored." *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1200 (4th Cir. 1993). In fact, with regard to nonresidents, general jurisdiction is ordinarily reserved for those defendants who have such substantial contacts with the forum state that they may be considered "essentially domiciled" within that state. *Estate of Bank v. Swiss Valley Farms, Co.*, 286 F.Supp.2d 514, 518 (D.Md. 2003).

The facts of this case show that Genworth lacks the "continuous and systematic" contacts with Maryland that would support a finding of general jurisdiction in this forum. Genworth has

submitted sworn affidavits averring that, at present and at all times relevant to this action, Genworth and its corporate predecessor, GEFA, were holding companies that:

- had no manufacturing operations and offered no products or services for sale to the public;

- did not own or rent real property in Maryland;

- had no offices, employees, or registered agents in Maryland;

- were not licensed or registered to do business in Maryland;

- did not pay corporate income, sales and use, or real and personal property taxes in Maryland;

- did not maintain a bank account in Maryland.

(Genworth Rep. in Support of Mot. to Dismiss, Ex. A, Bobitz Decl. ¶ 3.) Plan3 has not rebutted these sworn statements in any way, nor has it set forth facts that would support this Court's exercise of general jurisdiction over Genworth. Instead, Plan3 suggests that Genworth may be subject to general jurisdiction in Maryland because GEGA and GEGLAC conduct business there. Plan3 urges the Court to disregard the corporate form separating Genworth from its subsidiaries, alleging, in essence, that they have functioned as its agents rather than as independent corporate entities.

It is well established that, as a general matter, the contacts of a corporate subsidiary cannot impute jurisdiction over its parent entity. *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005). Jurisdiction over a parent company based on the conduct of a subsidiary is only proper upon a finding of circumstances that warrant piercing the corporate veil. *Newman v. Motorola, Inc.*, 125 F. Supp. 2d 717, 722 (D. Md. 2000). Whether particular circumstances justify piercing the corporate veil for jurisdictional purposes is a matter of state law. *See Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F3d 56, 61 (4th Cir. 1993). Maryland has adopted the "agency" test in deciding

whether to attribute the actions of a subsidiary to its parent; under the "agency" test, courts will pierce the veil only if the parent exerts considerable control over the activities of the subsidiary. The most important inquiry in determining whether a parent exercises sufficient control over its subsidiary to justify piercing the corporate veil is whether significant decisions of the subsidiary must be approved by the parent. *Translation Sys., Inc. v. Applied Technology Ventures*, 559 F. Supp. 566, 567 (D. Md. 1983). Other relevant factors include whether the parent and the subsidiary maintain separate books and records, employ separate accounting procedures, and hold separate directors' meetings. *Mylan Laboratories*, 2 F.3d at 61 (citing *Vitro Elec. v. Milgray Elec., Inc.*, 258 A.2d 749, 753 (Md. 1969). An additional consideration is whether the subsidiary has "some independent reason for its existence, other than being under the complete domination and control of another legal entity simply for the purpose of doing its act and bidding." *Harris v. Arlen Properties, Inc.*, 260 A.2d 22, 29 (Md. 1969).

To support its contention that the Court should disregard the corporate separateness of Genworth, GEGA, and GEGLAC, Plan3 makes two arguments. First, Plan3 argues that because one of the affidavits submitted by Genworth in support its Motion to Dismiss—that of Ward Bobitz—addresses only the present-day corporate structures of Genworth, GEGA, and GEGLAC, it cannot serve as a basis for finding that GEGA and GEGLAC were independent entities at the time of the acts alleged in the Complaint. As an initial matter, even if Genworth had failed to submit any affidavits at all, it is Plan3 that bears the burden of establishing that Genworth's corporate distinctiveness should be ignored. *See Kinney Shoe Corp. v. Polan*, 939 F.2d 209, 211 (4th Cir. 1991). Moreover, although the original declaration of Ward Bobitz is indeed written in the present tense, Ward Bobitz's second declaration, attached to Genworth's reply brief, explicitly asserts that

at the present time and *at all times relevant to the Complaint*, Genworth and its subsidiaries GEGA and GEGLAC have existed as separate corporate entities, maintained separate books and records, maintained their principal offices in separate locations, maintained separate boards of directors, and were uninvolved in one another's day-to-day management and operations. (Bobitz Decl. ¶¶ 2, 4-8.) Thus, any deficiency in the initial Bobitz affidavit stemming from its reference to Genworth's present-day corporate structure has been cured by the second affidavit, which pointedly addresses Genworth and its subsidiaries' corporate separateness at the time of the events giving rise to the Complaint.

Plan3's second argument for veil-piercing is equally unavailing. As evidence of Genworth's alleged dominance over its subsidiaries, Plan3 submits correspondence, sent by representatives of GEGA and GEGLAC, that bears the Genworth corporate logo.[1] Plan3 suggests that the subsidiaries' use of the Genworth Financial logo raises an inference that Genworth exercised sufficient control over its subsidiaries to warrant piercing the corporate veil. The Court cannot agree. Without additional evidence of parental dominance, a subsidiary's use of its parent company's corporate logo is inadequate to establish that the subsidiary is the parent's alter ego. *See, e.g., Fleetwood v. B.C.E., Inc.*, 2004 WL 903754, at *6 (D. Md. 2004) (subsidiary's use of parent company's logo insufficient to warrant piercing corporate veil); *Daniels v. Kerr McGee Corp.*, 841 F. Supp. 1133, 1136-37 (D. Wyo. 1993) (same); *Shapiro v. Ford Motor Co.*, 359 F. Supp. 350, 353-54 (D. Md. 1973) (use of "Ford" trademark by subsidiary, among other factors, insufficient to persuade the court to disregard corporate separateness); *Humana v. Kissun*, 471 S.E.2d 514, 516 (Ga. App. 1996) (common use of

---

[1]Plan3 also relies upon this correspondence in arguing that Genworth is subject to specific jurisdiction in this forum. The Court addresses this argument *infra*.

advertising and use of the same logo is not sufficient to pierce the corporate veil), *rev'd on other grounds*, 479 S.E.2d 751 (Ga. 1997). In the present case, apart from the correspondence attached to its opposition to Genworth's motion to dismiss, Plan3 has adduced no facts to overcome the strong presumption of corporate separateness that shields Genworth from liability for the acts of its subsidiaries. As such, Plan3 has failed to allege facts sufficient to to pierce the corporate veil for purposes of personal jurisdiction.

### B. Specific Jurisdiction

Traditionally, when an entity intentionally reaches beyond its boundaries to conduct business with foreign residents, the exercise of specific jurisdiction is proper. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Maryland's long-arm statute confers jurisdiction over a party that "transacts any business or performs any character of work or service in the State." Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1). Plan3 alleges that Genworth has "transacted business" in this forum; Plan3's allegations in this regard, however, are based entirely on certain correspondence sent into Maryland that bears the "Genworth Financial" logo. As noted above, this correspondence was sent by representatives of Genworth subsidiaries GEGA and GEGLAC and, just as it fails to provide a basis for piercing the corporate veil separating Genworth from its subsidiary companies, it also fails to create specific jurisdiction over Genworth in this forum. A subsidiary's use of a parent company's letterhead or logo is insufficient to establish personal jurisdiction over the parent entity. *See, e.g., Spring Patents, Inc. v. Avon Rubber & Plastics, Inc.*, 183 F. Supp. 2d 1212, 1219 (D. Haw. 2001); *Ne. Power Co. v. Balcke-Durr, Inc.*, 49 F. Supp. 2d 783, 788 (E.D. Pa. 1999); *3D Sys., Inc. v. Aarotech Labs, Inc.*, 160 F.3d 1373, 1380 (Fed. Cir. 1998). Because Plan3 has failed to set forth facts alleging that Genworth itself, rather than its subsidiaries, purposefully directed any activities

toward the State of Maryland, the Court concludes that it lacks a basis to assert personal jurisdiction over the company.

### C. Jurisdictional Discovery

Plan3 requests that, rather than grant Genworth's motion to dismiss, this Court delay its decision on the question of personal jurisdiction to allow Plan3 to conduct limited jurisdictional discovery regarding Genworth's contacts with the State of Maryland.  In considering a motion to dismiss for lack of personal jurisdiction, the Court may, in its discretion,  postpone the decision and permit discovery. *See Mylan*, 2 F.3d at 64. However, "[w]hen a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery." *Carefirst of Maryland*, 334 F.3d at 402; *see also Rich v. KIS California, Inc.*, 121 F.R.D. 254, 259 (M.D.N.C. 1988) ("[W]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by defendants, the Court need not permit even limited discovery . . . should it conclude that such discovery will be a fishing expedition.").

Here, Genworth has submitted sworn affidavits that would appear to preclude the assertion of personal jurisdiction in this forum. Although Plan3 suggests that Genworth has presented only a "meager record of conclusory affidavits," Plan3 has not alleged that the jurisdictional facts asserted in Genworth's affidavits are inaccurate. *See ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 716 n.3 (4th Cir. 2002) (affirming denial of jurisdictional discovery where plaintiff did not challenge jurisdictional facts in defendant's affidavits). Plan3 relies on *Androutsos v. Fairfax Hospital*, 594 A.2d 574 (Md. 1991), in arguing that a suit should not be dismissed for lack of personal jurisdiction before the plaintiff is permitted to conduct jurisdictional discovery. In

*Androutsos*, however, the plaintiff, who had presented the court with newspaper advertisements establishing that the defendant hospital had solicited customers in Maryland, sought to conduct additional discovery regarding the specific contacts the defendant had with the state. *See id.* at 577 (observing that plaintiff sought discovery concerning defendant's advertising expenditures in Maryland, gross revenues from Maryland sources, Maryland vendors, patients from Maryland, and the Maryland HMOs and insurance carriers with which defendant did business, and noting that "[t]his discovery was specifically aimed at the contacts which defendant had with this State"). In the instant case, Plan3 has not indicated to the Court how it expects to benefit from additional discovery, nor has it made any specific allegations regarding Genworth's contacts with this forum. Under such circumstances, requests for jurisdictional discovery are routinely denied. *See, e.g., Carefirst of Maryland*, 334 F.3d at 402-403 (affirming denial of discovery where plaintiff failed to make "any concrete proffer" in response to the defendant's jurisdictional affidavits); *Hill v. Brush Engineered Materials, Inc.*, 383 F. Supp. 2d 814, 819 (D. Md. 2005) (denying jurisdictional discovery where plaintiff "failed to proffer any further facts that, if proven, would affect this Court's exercise of jurisdiction"). Similarly, because Plan3 has failed to set forth any specific facts that would justify the assertion of personal jurisdiction, its request for jurisdictional discovery will be denied.

### B.   GEGA's Rule 12(b)(6) Motion to Dismiss

GEGA has moved to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. GEGA argues that Plan3 has based its breach of contract claim upon descriptive and hortatory language that does not, when read in context with the remainder of the Agreement, confer contractual rights upon Plan3. GEGA also maintains that Plan3 has failed to adequately state a claim for breach of contract because it has not identified or even described the

third-party service agreements that form the basis of its claim.

## Applicable Legal Standard

Under Rule 12(b)(6), dismissal of a complaint for failure to state a claim is not appropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).   In determining whether to dismiss a complaint pursuant to Rule 12(b)(6), this Court must view the well-pleaded material allegations in the light most favorable to the plaintiff and accept the factual allegations contained within the plaintiff's complaint as true. *See Flood v. New Hanover County*, 125 F.3d 249, 251 (4th Cir. 1997) (*citing Estate Constr. Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 217-18 (4th Cir. 1994)); *Chisolm v. TranSouth Finan. Corp.*, 95 F.3d 331, 334 (4th Cir. 1996).

The Court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) (citing *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir. 1981)); *Young v. City of Mount Ranier*, 238 F.3d 576, 577 (4th Cir. 2001) (the mere "presence ... of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6)").   Nor is the Court "bound to accept [Plaintiff's] conclusory allegations regarding the legal effect of the facts alleged." *United Mine Workers of Am. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085-86 (4th Cir. 1994); *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989). Thus, a complaint may be dismissed as a matter of law if it lacks a cognizable legal theory *or* if it alleges insufficient facts to support a cognizable legal theory. *See Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984) (citing 2A J. Moore, Moore's Federal Practice ¶ 12.08 at 2271 (2d ed. 1982)).

13

<u>Analysis</u>

Plan3's breach of contract claim hinges on the highlighted sentence in the following portion of the Pilot Program Agreement:

> B. GEGA will
>
> > i.  Negotiate, in good faith, an administrative services only agreement with each Benefit Plan accepted into the Pilot, and
> >
> > ii. Enter into an administrative services only agreement with such Benefit Plan, however, the terms of the Benefit Plan must be acceptable to GEGA, and
> >
> > iii. **Perform the services under such agreement consistent therewith.**

(Compl., Ex. A) (emphasis added.) These provisions of the Agreement describe how GEGA is expected to negotiate and enter into administrative service agreements ("ASAs") with "Benefit Plans"—i.e., third-party employers—and perform its obligations under those service agreements "consistent therewith." Citing a variety of claims processing problems that allegedly occurred after GEGA transitioned to a new claims processing platform, Plan3 contends that GEGA failed to meet its obligations to the employers and that, pursuant to the sentence highlighted above, Plan3 may now seek relief from GEGA based on GEGA's breach of the ASAs. GEGA, in turn, argues that the Pilot Program was limited, experimental, and not intended to give Plan3 the right to enforce the many rights and duties between GEGA and the employers created by the separately-negotiated service agreements. GEGA also argues that Plan3 has not adequately pled its claim of breach of contract, because it has failed to identify the participating employers that executed ASAs, attach the ASAs at issue, or cite the specific provisions of the ASAs that GEGA allegedly breached.

Addressing the latter argument first, the Court agrees that Plan3's Complaint has failed to satisfy applicable pleading standards. Plan3 argues that it has met the liberal pleading requirements of Fed. R. Civ. P. 8(a)(2) because it has identified the contract at issue—the Pilot Program Agreement—alleged that it was breached, and alleged that Plan3 has suffered damages as a result. Plan3's argument sidesteps the fact that the Pilot Program Agreement, standing alone, says absolutely nothing about the claims processing obligations that GEGA allegedly failed to meet. Assuming *arguendo* that the Pilot Program Agreement provides Plan3 with enforceable rights, those rights are entirely derivative of the rights of the third-party employers, and GEGA's specific duties towards those employers are set out in the separately negotiated ASAs. Stated differently, the clause in the Pilot Program Agreement that Plan3 relies upon is essentially an empty vessel, to be filled with the specific provisions of the ASAs. Yet, in bringing its claim, Plan3 has not attached a single ASA to its Complaint, nor has it identified which provisions, of which ASAs, concerning which parties, were allegedly breached. Thus, neither the Court nor GEGA has any basis for evaluating whether GEGA's alleged mishandling of claims constituted breach of its obligations to the employers.

While this Court is mindful that under the federal standards of notice pleading a plaintiff need only "set forth enough details so as to provide defendant and the court with a fair idea of the basis of the complaint and the legal grounds claimed for recovery," *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227 (4th Cir. 1998), a plaintiff must still "allege facts that, if proven, would provide an adequate basis for each claim." *Gray v. Dane County*, 854 F.2d 179, 182 (7th Cir. 1988). Here, although Plan3 has alleged that GEGA mishandled the medical claims of Pilot Program participants, the question of whether these alleged claims processing errors constituted a failure by

GEGA to "[p]erform the services under the agreement[s] consistent therewith" can be answered only by reference to the specific provisions of the underlying agreements—provisions that Plan3 has not identified, described, or articulated. Consequently, Plan3 has failed to adequately state a claim upon which relief may be granted. *See Timmons v. City of Hartford*, 283 F. Supp. 2d 712, 718 (D. Conn. 2003) ("In asserting a breach of contract claim, the complaint must allege the provisions of the contract upon which the claim is based."); *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001) (in pleading breach of contract, the "plaintiff must identify what provisions of the contract were breached as a result of the acts at issue"); *Posner v. Minnesota Min. & Mfg. Co., Inc.*, 713 F. Supp, 562, 563 (E.D.N.Y. 1989) (complaint asserting a breach of contract claim must "plead the terms of the agreement upon which defendant's liability rests"); *Pritchett v. Gen. Motors Corp.*, 650 F. Supp. 758, 763 (D. Md. 1986) (dismissing contract claim where plaintiff failed to allege "what [defendant's] contractual obligations were and how they were breached"). As such, Plan3's breach of contract claim must be dismissed.

Furthermore, even if Plan3 had adequately pled its breach of contract claim, the Court would still conclude that the Pilot Program Agreement, when read as a whole, does not create rights in Plan3 to enforce the terms of the separately negotiated ASAs. Under Connecticut law,[2] the Court must construe the Pilot Program Agreement in its entirety, "with each provision read in light of the other provisions and every provision given effect if it is possible to do so." *United Illuminating Co. v. Wisvest-Connecticut, LLC.*, 791 A.2d 546, 550 (Conn. 2002). Plan3's proposed reading of the Agreement—under which it claims the right to enforce GEGA's numerous contractual obligations

---

[2]The parties agree that, pursuant to a choice of law provision contained in the Pilot Program Agreement, Connecticut law governs Plan3's contractual claim.

to its third party employer clients, as set out in a potentially unlimited number of separately negotiated ASAs—is inconsistent with several other specific provisions of the Agreement and with its generally narrow scope and limited nature. For instance, the Agreement specifically provides that "Plan3 agrees that it shall do nothing to interfere with [GEGA's] relationship with the [employers] during the term of this Letter Agreement or after its termination." (Compl., Ex. A ¶ 8.) This non-interference clause would appear to conflict with Plan3's contention that it may sue for breach of contract whenever GEGA fails to meet its obligations to the employers under their independent administrative service agreements.

In addition, the provision of the Pilot Program Agreement upon which Plan3 bases its contractual claim—the clause stating that GEGA will "[p]erform the services under such agreement consistent therewith"—acquires meaning only through the incorporation of the terms of the ASAs. Yet, the Pilot Program Agreement contains an integration clause providing that it "constitutes the entire agreement between the parties with respect to the subject hereof," and a modification clause precluding any alterations to the agreement "unless made in writing and signed by a duly authorized representative of each party." (*Id.* ¶¶ 9.a, b.) The inclusion of these two clauses in the Agreement militates against Plan3's implicit contention that the parties intended for it to have flexible and expansive rights, the contours of which would shift and vary depending upon the particular terms of the ASAs.

Furthermore, Plan3's reading of the Agreement is inconsistent with the permissive, nonmandatory character of the provisions describing the parties' roles under the Pilot Program—in particular, the clauses providing that Plan3 would "encourage" employers to contract with GEGA and GEGLAC, that GEGA would enter into ASAs with employers whose benefit plans it found

"acceptable," and that GEGLAC would "consider" the stop loss applications of employers and issue them coverage if "the risk is acceptable." (*Id.* ¶¶ 6.a.iii, 6.b.ii, 6.c.i-ii.) This is the language of aspiration, not of compulsion—language which, in conjunction with the aforementioned factors, leads this Court to conclude that the statement "[p]erform the services under such agreement consistent therewith" was a description of GEGA's anticipated future conduct under the Pilot Program Agreement, not a conferral upon Plan3 of the right to enforce GEGA's obligations under the ASAs. Consequently, Plan3's breach of contract claim shall be dismissed for failure to state a claim upon which relief may be granted.

## III.   <u>CONCLUSION</u>

For all of the aforementioned reasons, the Court will GRANT Genworth's Motion to Dismiss for Lack of Personal Jurisdiction [9]. The Court will also GRANT GEGA's Motion to Dismiss for Failure to State a Claim [11]. An Order consistent with this Opinion will follow.

Date:   <u>February 21, 2005</u>                    <u>            /s/            </u>
                                                                        Alexander Williams, Jr.
                                                                        United States District Court